IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROHM AND HAAS ELECTRONIC
MATERIALS LLC,

     Plaintiff,

     v.

HONEYWELL INTERNATIONAL INC.,

     Defendant.

Civil Action No.: 06-297-GMS

**REDACTED VERSION OF D.I. 83**

**MEMORANDUM OF DEFENDANT HONEYWELL INTERNATIONAL INC. IN
OPPOSITION TO MOTION BY PLAINTIFF ROHM AND HAAS ELECTRONIC
MATERIALS LLC TO ENFORCE ALLEGED SETTLEMENT AGREEMENT**

BUCHANAN, INGERSOLL & ROONEY, PC
William E. Manning, Esq. (#697)
James D. Taylor, Jr., Esq. (#4009)
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
william.manning@bipc.com
james.taylor@bipc.com

Of Counsel:

BUCHANAN, INGERSOLL & ROONEY, PC
Constance S. Huttner
Ryan P. Farley
One Chase Manhattan Plaza
New York, NY 10005
(212) 440-4400

Dated: August 24, 2007     *Attorneys for Honeywell International Inc.*

Defendant, Honeywell International Inc. ("Honeywell"), respectfully submits this memorandum of law in opposition to the motion by plaintiff Rohm and Haas Electronic Materials LLC ("RHEM") to enforce an alleged settlement agreement between the parties (the "Motion"). For the reasons that follow, RHEM's Motion should be denied, and Honeywell should be awarded its costs associated herewith.

## PRELIMINARY STATEMENT

By its Motion, RHEM seeks to persuade this Court to summarily order Honeywell to comply with an unfinished settlement agreement that, by its own explicit terms, was not effective until execution. Enforcement of that draft agreement would require ████████████████████████████████████████. For the reasons that follow, RHEM is not entitled to this relief. Accordingly, its Motion should be denied.

As an initial matter, RHEM is not entitled to summary enforcement of the July 17 unexecuted, draft settlement agreement (the "July 17 Draft") because the record demonstrates that Honeywell told RHEM it would not be bound until the July 17 Draft was reviewed, approved and executed by the President of Honeywell's Specialty Materials business, Dr. Nance Dicciani. ███████████████████████████ ████████████████████████████████████████ ██████████████████████ This language is entirely consistent with the parties' course of dealings throughout their lengthy settlement negotiations, which confirm that RHEM understood there would be no "deal" until there was a signed document. Because this never happened as RHEM concedes, there is no "agreement" for the Court to enforce.

Even if the Court were to accept RHEM's invitation to treat the July 17 Draft as a binding agreement, the Court should still deny RHEM's Motion because Honeywell is entitled to rescind the alleged agreement because of RHEM's failure to disclose (and Honeywell's consequent lack of knowledge about) a change in the status of the pending reexaminations, constituting fraudulent or negligent conduct by RHEM and a mistake by Honeywell as to a material fact.  More particularly, RHEM concedes that Honeywell refused to proceed with the alleged settlement only after it discovered that RHEM had scheduled and participated in a July 12, 2007 interview (the "July 12 Interview") with the United States Patent and Trademark Office ("PTO") Examiner assigned to the pending reexamination of one of the patents in suit.  RHEM scheduled this interview for the express purpose of lobbying the Examiner to allow its pending claims, which it had already once amended in an effort to overcome the Examiner's rejections.  Significantly, the Examiner did not agree to allow any of RHEM's new or amended claims during the July 12 Interview.  In fact, the Examiner maintained all of his bases for rejecting all claims, despite RHEM trying to persuade him in formal papers submitted before and apparently at the Interview.

RHEM concealed the July 12 Interview from Honeywell during the final stages of the negotiations.  RHEM knew, or should have known, that Honeywell would want to know about the July 12 Interview and its results before concluding its settlement negotiations with RHEM.  RHEM also should have known that Honeywell would regard the Interview's negative outcome as reducing the likelihood that RHEM's patents will emerge from reexamination ██████████████████████████████████ ████████████████████████.  Honeywell had repeatedly asked RHEM if there were

new developments in the pending reexaminations during the parties settlement negotiations. Moreover, Honeywell had insisted that RHEM ████████████████ ████████ to "diligently" notify Honeywell of any communications with the PTO because the pending reexaminations were *ex parte*, and Honeywell did not want to rely upon the PTO's Public PAIR website for timely reports on new developments.[1]

Despite this knowledge and its prior assurances that there were no new developments in the reexaminations, RHEM chose to say *nothing* to Honeywell about the July 12 Interview, either before or after it took place. Instead, after months of slow and difficult negotiations, in mid-July RHEM was suddenly in a hurry to get the settlement agreement done and, on July 17, hastily faxed Honeywell an executed copy of the proposed settlement just hours after the parties tentatively concluded their negotiations. Because of this sudden change in RHEM's negotiating tone, Honeywell's in-house counsel began daily checks of the PTO's PAIR website for news of any developments in the pending reexaminations. On July 20, 2007, this check revealed that the PTO had posted a summary of the July 12 Interview on PAIR (the "Interview Summary"). Shortly thereafter, Honeywell notified RHEM it would not proceed with the proposed settlement ███████████████████████████.

RHEM does not deny that it consciously failed to tell Honeywell about the July 12 Interview, or that Honeywell was keenly interested in any new developments in the pending reexaminations. Rather, it seeks to excuse its lack of candor by pointing the finger at Honeywell's litigation counsel, Constance Huttner, who RHEM claims "failed to provide her change of address to the PTO." RHEM Br. at 4. According to RHEM, "[b]ut

---

[1]    "PAIR" stands for "Patent Application Information Retrieval." PAIR is a public database available on the PTO website, www.uspto.gov.

for Ms. Huttner's failure to update her address, Honeywell would have been timely

informed of the Interview summary by the PTO." *Id.* This excuse, however, is both

factually and legally inadequate. In the first place, Ms. Huttner *did* notifiy the PTO of

her new address on April 19, 2007, and her current address was thereafter accurately

identified on the PTO's website. Secondly, RHEM itself had a duty under the

circumstances to disclose the July 12 Interview to Honeywell. Its attempt to shift this

legal responsibility to Ms. Huttner speaks volumes about its inability to justify its own

misconduct.

Although RHEM now seeks to trivialize the significance of the July 12 Interview,

its present nonchalance is belied by its contemporaneous decision to remain silent about

the scheduling and outcome of the Interview, which it obviously knew would jeopardize

its chances for █████████████████████. RHEM gambled it could schedule and

be successful at the July 12 Interview before concluding its settlement negotiations with

Honeywell. RHEM also made a conscious choice to drag out the parties' settlement

negotiations while the reexamination proceedings were ongoing, knowing that any

negative developments could scuttle any proposed deal. Presumably RHEM assumed

this risk in hopes that favorable developments at the PTO would make any settlement

███████████████████████. In sum, RHEM gambled it

could proceed down parallel paths without tripping up, and without Honeywell finding

out. Honeywell should not be penalized because RHEM lost and concealed the bet.

## SUMMARY OF RELEVANT FACTS

The facts relevant to Honeywell's opposition to RHEM's Motion are fully set forth

in the accompanying Declarations of Scott D. Jacobson, Esq. ("Jacobson Declaration" or

"Jacob. Dec.") and Constance S. Huttner, Esq. ("Huttner Declaration" or "Hutt. Dec."),
which are incorporated herein by reference. For the Court's convenience, a summary of
the most relevant facts is set forth below.

### A.     The Pending Reexamination Proceedings

RHEM brought this case in May of 2006 alleging that Honeywell had infringed
RHEM's U.S. Patent Nos. 6,471,128 (the "'128 patent") and 6,773,864 (the "'864 patent")
by making and selling SLAM 248, an antireflective coating for semiconductor wafers.

On December 1, 2006, Honeywell sent the PTO written requests seeking
reexamination of the patents in suit over certain prior art that Honeywell had identified.
*See* Jacob. Dec. ¶ 2. The PTO granted Honeywell's reexamination requests on January 25
('128 patent) and March 23, 2007 ('864 patent) (collectively, the "Reexaminations")
finding substantial new questions of patentability of all claims. *Id.* ¶ 4, Ex. 2 and ¶ 5, Ex.
3. Each reexamination was assigned to a different PTO Examiner. *Id.* ¶ 8.

On April 16, 2007, the PTO Examiner assigned to the '128 patent issued an office
action rejecting all of the issued claims over the prior art. *Id.* ¶ 7. RHEM responded to
this office action on June 11, 2007 by materially amending the '128 patent claims, adding
new claims, and arguing that the new and amended claims were patentable over the prior
art. *Id.* ¶ 7. As a result of this amendment, none of RHEM's original '128 patent claims
remained intact.

Following the submission of its June 11 amendment, at a time presently unknown
to Honeywell but certainly during the parties' ongoing settlement discussions, RHEM's

patent attorney, Peter Corliss,[2] requested an interview with the '128 patent Examiner. The purpose of this interview was to discuss RHEM's amendments and response in an effort to persuade the Examiner to allow RHEM's new and/or amended claims over the prior art that the Examiner had relied on for his initial rejections.

Before requesting this interview, Mr. Corliss must have had a conversation with Darryl Frickey, the in-house patent counsel at RHEM responsible for the patents in suit. Mr. Frickey was also heavily involved in the parties' settlement discussions, as more fully discussed below. The Interview was ultimately scheduled for July 12, and was attended by Mr. Corliss along with James Thackeray, an employee of RHEM and one of the inventors of the patents in suit. *Id.* ¶ 49, Ex. 18.

At the conclusion of the July 12 Interview, with Mr. Corliss there, the '128 patent Examiner prepared a written "*Ex Parte* Reexamination Interview Summary" on PTO form PTOL - 474 (the "Interview Summary"). *See id.* The '128 patent Examiner checked the box indicating that a copy of the Interview Summary was personally given to Mr. Corliss, the patent owner's representative, at the conclusion of the meeting. *See id.* The Examiner also mailed a copy of the Interview Summary to Honeywell's representative, Constance Huttner. *See id.* However, the Examiner inexplicably sent the Interview Summary to Ms. Huttner's prior law firm, Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden"), even though Ms. Huttner had filed a change of address form with the PTO on April 19, 2007, and was correctly identified as an employee of her current law firm, Buchanan, Ingersoll & Rooney, PC ("Buchanan") in the PTO's "Patent Attorneys/Agents" database. *See* Hutt. Dec. ¶ 4. The Interview Summary was received by Skadden on

---

[2]     Mr. Corliss is a patent attorney at Edwards, Angel, Palmer & Dodge, LLP ("Edwards").

Friday, July 20, the same day that it was posted to PAIR, and was forwarded to Ms. Huttner at Buchanan the next business day, on Monday, July 23, 2007. *Id.* ¶ 6.

The Interview Summary made note of RHEM's arguments regarding the alleged patentability of its new and amended claims. Most significantly, the Interview Summary noted that "[n]o agreement to patentability of any of the claims was agreed to." *See* Jacob. Dec. ¶ 50, Ex. 18. The Summary further noted that RHEM had agreed to file a Supplemental Amendment setting forth an additional amendment to one of its newly added claims, and "flush[ing] out the arguments" in support of patentability. *Id.* ¶ 48, Ex. 18; Hutt. Dec. ¶ 5, Ex. 4. RHEM filed this Supplemental Amendment -- RHEM's *third attempt* to secure an agreement regarding the patentability of the '128 patent claims -- on July 19, 2007. *See* Jacob. Dec. ¶ 54, Ex. 19; Hutt. Dec. ¶ 13-14, Ex. 8. RHEM provided Honeywell no notice regarding its filing of the Supplemental Amendment.

Honeywell does not know when RHEM first learned the Interview Summary was mistakenly mailed to Ms. Huttner's former address. Notably, however, RHEM's attorney, Mr. Corliss, chose to use the same erroneous address when he mailed Ms. Huttner the Supplemental Amendment, on July 19, fully one week after the July 12 Interview took place. *See* Hutt. Dec. 14, Ex. 8. Although Mr. Frickey and Mr. Mulveny were both aware of Ms. Huttner's current address and presumably saw that Mr. Corliss had used the wrong address, neither took steps to rectify the situation. Further, neither Mr. Frickey nor Mr. Mulveny even mentioned anything about the Interview in the closing stages of the negotiations to Ms. Huttner or Honeywell. *Id.* ¶ 12; Jacob. Dec. ¶¶ 49, 54 & 59.

The Supplemental Amendment was not posted to PAIR until July 31, 2007. *See* Jacob. Dec. ¶ 54.

7

**B.      The Parties' Settlement Negotiations**

     1.      **The parties did not reach an "agreement in principle" in April, 2007, as RHEM claims in its brief.**

Although RHEM's brief avers that the parties reached an "agreement in principle" to settle this case "around the end of April of 2007," in fact, the parties merely began their settlement discussions at this time. RHEM Br. at 4; Jacob. Dec. ¶ 10-11. As of April, 2007, ███████████████████████████████████████████████████████████ ████████████████████████████████ *See* Jacob. Dec. ¶11. Thereafter, virtually all of the settlement discussions took place between the parties' respective counsel and involved numerous complex legal issues. *Id.* ¶ 12-13.

On May 11, 2007, Scott Jacobson, Honeywell's in-house counsel, e-mailed RHEM's in-house counsel, Mr. Frickey, a draft, unsigned "key term sheet for a Settlement and License Agreement to resolve the dispute between Rohm and Haas and Honeywell" (the "Term Sheet"). *Id.* ¶ 15, Ex. 4. Mr. Jacobson's e-mail made clear that no "agreement in principle" had been reached at that time, stating that "[i]f the enclosed is acceptable, we will proceed to the formal document drafting stage. If not, we should plan to have a telecom soon after we receive your written comments." *Id.*

Ten days later, on May 21, 2007, Mr. Jacobson sent Mr. Frickey an e-mail asking him when he "thought Rohm and Haas would have feedback on the Key Terms document that we [Honeywell] sent on May 11." *Id.* ¶ 16, Ex. 5. Mr. Frickey responded later that evening, stating "[y]our document is currently under review by the business and I expect a reply later this week. Unfortunately, business travel seems to be a bit of an obstacle." *Id.* Mr. Frickey's e-mail proves there was no "agreement in principle" in April 2007.

2.    **RHEM knew that Honeywell wanted "real time" information concerning the status of the pending reexaminations.**

Between May 29 and June 19, 2007, counsel for the parties exchanged numerous drafts and revisions to the proposed Term Sheet, and participated in several conference calls to discuss unresolved business issues pertaining to the proposed settlement agreement. *Id.* ¶¶ 17-20. By June 20, 2007, the parties had reached an impasse with respect to several issues, had not yet exchanged even a draft settlement agreement, and had resumed litigation. *Id.* ¶ 21. This resumption of hostilities is evidenced, *inter alia*, by a letter sent by RHEM's outside litigation counsel, Daniel Mulveny on June 20, 2007, demanding discovery "[i]n view of the parties' inability to reach an agreement regarding an out-of-court settlement of this matter . . . ." Declaration of Daniel C. Mulveny, dated July 31, 2007, ¶ 5, Ex. D. Subsequently, the parties resumed settlement negotiations. *See* Jacob. Dec. ¶ 22.

On Friday, June 22, 2007, Mr. Mulveny sent Honeywell a first draft of a settlement and license agreement for Honeywell's review. *Id.* ¶ 22, Ex. 7.



*Id.* On June 26, 2007, Honeywell's in-house counsel, Mr. Jacobson, sent Mr. Mulveny Honeywell's mark-up of the June 22 draft. *Id.* ¶ 23, Ex. 8. Honeywell's mark-up modified paragraph 3.5 to require RHEM

*Id.* ¶ 23, Ex. 8. ¶ 3.5. (emphasis added)

Mr. Mulveny responded to Honeywell's mark-up on June 28, 2007. *Id.* ¶ 24. Commenting on Honeywell's modification of paragraph 3.5, Mr. Mulveny observed:



*Id.* Consistent with this position, the draft agreement attached to Mr. Mulveny's e-mail

changed paragraph 3.5 to state: ███████████████████████████

███████████████████████████████████████

███████████████████████████████ *Id.* ¶ 24, Ex.

9 ¶ 3.5. (emphasis added).

On July 2, 2007, the parties participated in a teleconference to discuss RHEM's

June 28 draft agreement. *Id.* ¶ 26. During this teleconference, the parties had a lengthy

and heated discussion about RHEM's proposed modification to paragraph 3.5. *Id.*

Honeywell's counsel, Mr. Jacobson, rejected RHEM's suggestion that PAIR would

provide Honeywell with adequate notice of any new developments because of the known

delay associated with PAIR postings, and the PTO's occasional failure to post new events

at all. *Id.* Mr. Jacobson also rejected RHEM's suggestion that it would be unduly

burdensome for RHEM to notify Honeywell about new PTO developments. He noted

that RHEM could simply instruct Mr. Corliss to copy Honeywell on all documents sent to

or received from the PTO. *Id.*

Finally, Mr. Jacobson explicitly asked Mr. Frickey and Mr. Mulveny during the

July 2 call whether there had been any new developments in the Reexaminations. *Id.* ¶

27. Mr. Mulveny and Mr. Frickey both confirmed that nothing new had occurred. *Id.*

Later on July 2, 2007, Mr. Mulveny e-mailed Honeywell "the latest draft reflecting our discussions [of earlier] today." *Id.* ¶ 29, Ex. 10. Paragraph 3.5 of this draft included some of Honeywell's language requiring RHEM ███████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ *Id.* RHEM's change of the timeframe to merely a ██████████████████████ was not acceptable to Honeywell. Therefore, on July 12, 2007 -- the very day that Mr. Corliss was meeting with the PTO Examiner (unbeknownst to Honeywell) -- Honeywell again modified paragraph 3.5 to require RHEM ████████████████████████████████ ███████████████████████████████████████████████

*Id.* ¶ 33, Ex. 11 ¶ 3.5.

Between July 13 and 16, 2007, after RHEM had unbeknownst to Honeywell met with the Examiner and knew they had not reached agreement with the Examiner regarding the patentability of their pending amended claims, the parties continued to negotiate various provisions of the proposed settlement agreement, including a new substantive modification pertaining to ████████████████████████████████ ███████████████████████ RHEM sought to make this material change on the afternoon of Friday, July 13, 2007, even though it previously agreed otherwise. *Id.* ¶ 34; Hutt. Dec. ¶ 7. On the morning of July 16, 2007, Honeywell's counsel, Ms. Huttner, called Mr. Mulveny to reject RHEM's proposed modification. Hutt Dec. ¶ 8. Before Ms. Huttner could communicate this rejection, however, Mr. Mulveny surprisingly informed her that RHEM's demand was no longer required, which was unusual in view of RHEM's prior negotiating tactics. *Id.*; Jacob. Dec. ¶ 3.

11

Thereafter, Mr. Mulveny e-mailed Honeywell a revised draft agreement, which also changed paragraph 3.5 to provide ███████████████████████████ ███████████████████████ *See* Jacob. Dec. ¶ 36, Ex. 12.  At 6:32 P.M. that same evening, Mr. Mulveny e-mailed Mr. Jacobson asking for Honeywell's comments on RHEM's latest proposal. *Id.* ¶ 37, Ex. 13.  Mr. Mulveny's e-mail further expressed sudden urgency on RHEM's part to quickly conclude the settlement stating, "I would like to call the Court tonite [sic] to leave a message that an agreement has been reached and that the parties will be working to execute the agreement tomorrow." *Id.*

On July 17, 2007, Ms. Huttner, Mr. Frickey and Mr. Mulveny had a teleconference to discuss the July 16 draft. *Id.* ¶ 39; Hutt. Dec. ¶ 9.  Uncharacteristically, RHEM gave up on the remaining issue relating to this draft with only minimal discussion. Hutt. Dec. ¶ 9.  Toward the end of this call, Ms. Huttner again asked Mr. Mulveny and Mr. Frickey whether anything new had happened in the Reexaminations. Mr. Mulveny and Mr. Frickey again responded that there was nothing new to discuss. *Id.* Thereafter, at 3:38 P.M., Mr. Mulveny e-mailed Ms. Huttner and Mr. Jacobson a new draft of the proposed settlement agreement -- the July 17 Draft. *Id.* ¶ 11, Ex. 7; Jacob. Dec. ¶ 39, Ex. 14.  Mr. Mulveny's cover e-mail stated:

> Connie, Scott, and Darryl:
>
> Enclosed is the FINAL version based on our teleconf. earlier today and the version Connie sent to me at 2:45p today.  I think we're done.  Please circulate *and if there's no further c*hanges, execute.
>
> Connie, once you hear from Scott that it is to be executed, let's set up a call to Judge Sleet and break the news.

*Id.* (emphasis added). Thus, while RHEM may have been hopeful that the July 17 Draft was a final document, Mr. Mulveny's remarks confirm that he fully understood the Draft could be modified based on Honeywell's further review.

Mr. Jacobson replied to Mr. Mulveny's e-mail a few minutes later, at 3:44 P.M., indicating that he would "make a final read, *and if it is consistent with my expectations*, I will circulate for execution." *Id.* ¶ 40, Ex. 15. (emphasis added). Subsequently, Mr. Jacobson sent the July 17 Draft to Dr. Dicciani for her review. RHEM also forwarded the July 17 Draft to its Chief Executive, Yi Hyon Paik, for his approval and signature. At approximately 6:40 P.M. on July 17, RHEM faxed an executed version of the July 17 Draft to Ms. Huttner and Mr. Jacobson, noting that "[t]omorrow, a signed original will be sent to Scott by FedEx overnight delivery. I look forward to receiving the same from Honeywell." *Id.* ¶ 41, Ex. 16.

On July 18 at 10:10 A.M., Mr. Mulveny e-mailed Mr. Jacobson, "We're trying to set up a teleconference to inform the Court about the settlement this morning. Can you tell me when you expect to get the signed Agreement for Honeywell?" *Id.* ¶ 42, Ex. 17. Mr. Jacobson responded:

> Likely tomorrow. Nance Dicciani, Specialty Materials President, is the person that needs to sign the document. She is currently traveling and I am trying to track her down. Her assistant told me that she will not be able to receive the document today, but I am making arrangements to try and get it to her tomorrow and then get it back to you by tomorrow late afternoon. I have not been able to get the document yet because of travel schedules. Thanks for your patience, Scott.

*Id.* ¶ 43, Ex. 17.

Later that evening, Mr. Jacobson told Mr. Mulveny that he was having "a hard time tracking down Nance on her business trip. I was told that she will be returning to

the office on Monday, so in the worst case, I should be able to get this to her on Monday." *Id.* ¶ 44, Ex. 17. By the time Monday arrived, however, Honeywell had learned about the July 12 Interview from PAIR. Thereafter, as discussed below, it advised RHEM that it had no interest in proceeding with the proposed settlement unless the financial terms were substantially modified to reflect Honeywell's view that RHEM's chances of emerging from the Reexaminations with valid claims had materially worsened.

### C.    Honeywell's Discovery That RHEM Had Withheld Material Information About The July 12 Interview

Because of RHEM's uncharacteristic malleability with respect to the remaining open issues during the July 16 and 17 teleconferences after many months of wrangling, and RHEM's perceived atypical urgency in wanting to finalize the settlement, Honeywell became suspicious. Mr. Jacobson checked PAIR several times on July 16 and 17 to see if anything new had been reported. *Id.* ¶ 47. On July 18, 2007, the day before he left on vacation, Mr. Jacobson instructed a Honeywell paralegal to continue to check PAIR at the beginning and end of each day. *Id.* ¶ 48. On the morning of July 20, 2007, this paralegal saw the Interview Summary and forwarded the Summary to her supervisor, Shannon Votava, in-house General Counsel for Honeywell's Electronic Materials business. *Id.* ¶ 49. Ms. Votava forwarded the Summary to Ms. Huttner, who had not yet received notice from the PTO that the July 12 Interview had occurred. Thereafter, after consultation with counsel, Dr. Dicciani determined that Honeywell's interests would be better served by defending this litigation rather than by settling ████████████████

████████████████████████████████████████████████

██████████████████████. *Id.* ¶ 54-55.

14

On July 25, 2007, Dr. Rebecca Liebert, Honeywell's Vice President and General Manager, called Mr. Paik to advise him that Honeywell had learned about the July 12 Interview and its outcome despite RHEM's efforts to keep this information quiet until the parties had concluded their deal. *Id.* ¶ 55. As a result, she told him that █████████ ████████████████████████████████████████████ ████████████████████████ *Id.* ████████████████████████ ████████████████████████████████████████████ ████████████████ *Id.*

At roughly the same time, Ms. Huttner e-mailed Mr. Mulveny to advise him that Honeywell had rejected the July 17 Draft: "After we last spoke, we learned from public PAIR (not you or Darryl) about the interview with the examiner assigned to the '128 case. This has created some problems for the settlement, which I understand our clients discussed between themselves this morning. I believe we are waiting to hear back from your side. I will keep you posted." *See* Hutt. Dec. ¶ 16, Ex. 9.

Later on July 25, 2007, Ms. Huttner advised Mr. Mulveny that she intended to advise the Court there was no settlement.[3] After Ms. Huttner delivered her letter to the Court on July 26, Mr. Rudolph E. Hutz wrote to advise the Court of RHEM's intention to file the instant Motion to enforce the July 17 Draft.

---

[3]    On July 18, 2007, as RHEM notes in its brief, outside counsel jointly called the Court to advise the Court of their belief that their clients had reached a settlement. When this call was made, neither Honeywell nor its outside counsel knew about the July 12 Interview, and expected that the Draft would be executed after Dr. Dicciani's review. Moreover, both parties' counsel wanted to inform the Court about the pending settlement because the parties were due to submit their proposed claim interpretations under the Court's scheduling order and the Court had entered an order disallowing any further stipulations extending the deadline.

## ARGUMENT

### I.    STANDARD OF REVIEW

Motions to enforce settlement agreements are similar to motions for summary judgment. *See Tiernan v. Devoe,* 923 F.2d 1024, 1031-32 (3d Cir. 1991) ("The stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same -- both deprive a party of his right to be heard in litigation."). Thus, the same standard of review is applied: Courts "must treat all the non-movant's assertions as true, and when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." *Id.* at 1032 (citation omitted). Summary judgment cannot be granted in favor of the movant "unless there is no genuine issue of material fact." *In re Enstar Corp.*, Civ. A. No. 7802, 1989 Del. Ch. LEXIS 10, at *11 (Del. Ch. Jan. 31, 1989) (applying summary judgment standard to settlement contract) (citation omitted), *rev'd on other grounds*, 604 A.2d 404 (Del. 1992).

"Courts should not summarily enforce purported settlement agreements, in the absence of an evidentiary hearing, where material facts concerning the existence or terms of an agreement to settle are in dispute." *The Intellisource Group, Inc. v. Williams*, No. C.A. 98-57-SLR, 1999 U.S. Dist. LEXIS 12446, at *10-11 (D. Del. Aug. 11, 1999). Summary judgment is particularly inappropriate in disputes like this one "concerning the formation and interpretation of contracts" because the determination of whether a contract has been formed typically requires the Court to determine the parties' intent in light of all the relevant facts, including credibility. *Id.*; *see also E.I. Du Pont de Nemours & Co. v. Florida Evergreen Foliage*, 744 A.2d 457, 464 (Del. 1999); *Alro Assocs., L.P. v. Hayward*, Civ. A. No. 19544, 2003 Del. Ch. LEXIS 112 (Del. Ch. Oct. 31, 2003); *see*

*generally* 10A WRIGHT & MILLER, *Federal Practice and Procedure*, Civil Sec.
2730.1.

Accordingly, the Court must deny RHEM's Motion if it determines that there are
material factual disputes about the parties' intent to bind themselves to the July 17 Draft
in the absence of a final, signed agreement. The Court must also deny RHEM's Motion if
it finds there are material fact questions concerning Honeywell's contention that the July
17 Draft was procured by fraud, misrepresentation or mistake. As shown below,
RHEM's Motion must be rejected on both of these grounds.

## II.   HONEYWELL NEVER AGREED TO BE BOUND BY THE JULY 17 DRAFT

A written settlement agreement is a contract. *E.I. Du Pont*, 744 A.2d at 464.
Therefore, in order for a settlement agreement to be binding, there must be an offer by
one party and acceptance by the other. *See, e.g., Mann v. Cargill Poultry, Inc.*, C.A. No.
88c-AU37, 1990 Del. Super. LEXIS 225 (Del. Super. Ct. Jun. 13, 1990), *aff'd*, 584 A.2d
1228 (Del. 1990); *Murphy v. State Farm Ins. Co.*, C.A. No. 96C-02-243 WTQ, 1997 Del.
Super. LEXIS 219 (Del. Super. Ct. Jun. 13, 1997). Where, as here, "the parties positively
agree that there will be no binding contract until the formal document is executed,"
Delaware law is also clear that no enforceable contract is created until execution occurs.
*Transamerican Steamship Corp. v. Murphy*, Civ. A. No. 10511, 1989 Del. Ch. LEXIS 13,
at *4 (Del. Ch. Feb. 14, 1989) (concluding there was no enforceable settlement because
defendants had conditioned the creation of contractual liability on the execution of a
written agreement); *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156 (Del. 1998)
(when parties intend an agreement to become enforceable only upon signing, their intent
will be honored); *see also Nippon Chems. Sales Co. v. Texaco Inc.*, Civ. A. No. 14786,

1997 Del. Ch. LEXIS 122 (Del. Ch. July 9, 1997) (denying summary judgment where
there was conflicting evidence whether a party intended to be bound before an alleged
contract was signed).

In *Transamerican Steamship*, the plaintiff moved to enforce an alleged settlement
agreement after the defendants refused to finalize the settlement. The court directed the
parties to initiate a separate lawsuit and to submit stipulated facts after completing
relevant discovery concerning their alleged agreement. Although the parties stipulated
that settlement negotiations were concluded and that they had reached an agreement with
respect to the substantive terms of the proposed settlement, the defendants argued that
they had told the plaintiff "there is no deal until there's a signed agreement." Before
execution could occur, however, "defendants withdrew from the agreement . . . upon
learning of a material development" that affected their valuation of the proposed deal.
*Transamerican Steamship*, 1989 Del. Ch. LEXIS 13 at *2.

After reviewing all of the pertinent evidence, including the testimony of the
attorneys involved in the negotiations, the Chancery Court ruled that there was "no
enforceable contract . . . despite agreement upon all of the substantive terms of a
contract[, because the Court could] not treat the insistence upon a writing as unimportant
when the party to be bound treated it as material." *Id*. at *6. The Court elaborated:

> The assumption of contractual liability --- that is, the creation of a contract
> --- is, of course, a voluntary act. It remains, in each instance, for the
> parties themselves to determine what are the preconditions for the creation
> of such liability. Where one of the contracting parties states that he will
> not be bound until an event such as the signing of a memorandum that
> might not otherwise be required . . . occurs, he will not be bound before
> that condition is satisfied, even though an agreement on all of the material
> terms of the contract have been reached. In Williston's words "[i]t is
> everywhere agreed that if the parties contemplate a reduction to writing of
> their oral agreement before it can be considered complete, there is no

contract until the writing is signed." 1 *Williston on Contracts* § 28, pp. 66-
67.

*Id.* at \*3.

This Court should reach the same conclusion as the Court in *Transamerican Steamship*, and find that the July 17 Draft is not a binding agreement.  Honeywell and RHEM both understood there would be no binding contract until the July 17 Draft was reviewed, approved and signed by Dr. Dicciani and Mr. Paik.  Indeed, the July 17 Draft, on its face, ███████████████████████████████████████████
███████████████████████████████████████  *See* Jacob. Dec. ¶ 39, Ex. 14.  This recital is consistent with other exchanges between the parties during their lengthy settlement negotiations, which included frequent statements by Mr. Frickey and Mr. Jacobson about the need for approvals from Dr. Dicciani and Mr. Paik.

Because of this understanding, RHEM's counsel did not object when Mr. Jacobson explicitly told him that he needed to circulate the July 17 Draft to Dr. Dicciani for her review, approval and signature, and that Dr. Dicciani was traveling, and might not be able to review or sign the Draft until Monday, July 23.  *Id.* ¶ 43-44.  To the contrary, Mr. Frickey wrote that RHEM would "FedEx" a "signed original", and that RHEM "look[ed] forward to receiving the same from Honeywell." *Id.* ¶ 41, Ex. 16.  Mr. Mulveny similarly acknowledged the need for a signed agreement in his July 18, 2007 e-mail to Mr. Jacobson, which asked when he could "expect to get the signed Agreement for Honeywell." *Id.* ¶ 42, Ex. 17.  And significantly, RHEM's Motion does not contend that Mr. Jacobson, or any other lawyer for Honeywell, had the authority to enter into a binding contract on Honeywell's behalf.

It is thus clear, or at least materially disputed, that as in *Transamerican Steamship,* both parties here agreed and understood throughout their negotiations that there would be no enforceable contract until the exchange of a signed settlement agreement.  Because this concededly never happened, RHEM's Motion should be denied. Any doubts about the parties' intent must be resolved in favor of Honeywell.

## III.    THE JULY 17 DRAFT SHOULD BE RESCINDED EVEN IF IT WAS BINDING ON HONEYWELL

Even if the July 17 Draft was binding on Honeywell, this Court still should deny RHEM's Motion because any agreement by Honeywell should be rescinded due to RHEM's fraudulent or negligent misrepresentations or omissions, or Honeywell's mistaken belief about the status of the pending Reexaminations.

### A.    RHEM Had A Duty Under Delaware Law To Tell Honeywell About The July 12 Interview

Although RHEM argues that it "had no obligation to re-serve [the Interview Summary on] Honeywell," it does not and cannot argue that it had no legal obligation under Delaware law to tell Honeywell about the schedule and results of the July 12 Interview during the parties' negotiations.  Specifically, under Delaware law, "a duty to speak may arise from circumstances other than a fiduciary or confidential relationship." *Student Fin. Corp. v. Royal Indemnity Co.*, Civ. A. No. 03-507 JJF, 2004 U.S. Dist. LEXIS 4952, at *5 (D. Del. Mar. 23, 2004).  For example, a party to a business transaction has a duty to exercise reasonable care to disclose "information that if undisclosed will cause its partial statements of facts to be misleading."  *Id.* at *5 (citing Restatement (Second) of Torts § 551).  This duty to disclose also arises if the party "knows that the other is about to enter into it [the transaction] under a mistake . . . and

that the other because of the relationship between them . . . or other objective circumstances would reasonably expect a disclosure of those facts." *Id.*; *see also Mentis v. Delaware Am. Life Ins. Co.*, C.A. No. 98C-12-023 WTQ1, 1999 Del. Super. LEXIS 419 (Del. Super. July 28, 1999) (holding that a duty to speak may arise from a partial disclosure of facts that requires further disclosure to prevent a misleading impression); *Landkford v. Tennefoss*, C.A. No. 97-12-053, 1998 WL 1557441 at *4 (Del. Com. Pl. Oct. 20, 1998) (finding a duty to speak where one party made affirmative representations that were relied upon by the other party during negotiations, and subsequently failed to disclose inconsistent information).

Similarly, RHEM had an affirmative duty to tell Honeywell about the scheduling and results of the July 12 Interview under Delaware law. Honeywell's counsel repeatedly asked RHEM's counsel during their negotiations whether there were any new developments in the Reexaminations. *See* Jacob. Dec. ¶ 28; Hutt. Dec. ¶¶ 2 & 9. These inquiries were made at least on July 2 and July 17, and uniformly produced assurances that nothing new had had happened. *Id.* In making these representations, RHEM unquestionably understood that Honeywell was asking for real time information about the Reexaminations because it had no other means of obtaining this information, which it regarded as material to its economic evaluation of the settlement. In fact, Mr. Jacobson was adamant during the parties' negotiations that RHEM should "immediately," "promptly" and "diligently" notify Honeywell about any communications to or from the PTO. *See, e.g.*, Jacob. Dec. ¶¶ 24, 26, 33, 36..

Once RHEM scheduled the July 12 Interview, it had an affirmative duty to correct its prior representations that nothing new had happened, and to answer truthfully if asked.

RHEM's duty to speak included the obligation to promptly provide Honeywell with a copy of the Interview Summary, which the '128 patent Examiner had personally given to RHEM's lawyer, Mr. Corliss, on July 12, 2007. *See* Jacob Dec. ¶ 49, Ex. 18. RHEM instead did and said nothing, leaving it to the Examiner to mail a copy of the Interview Summary to Honeywell's counsel at her prior address. RHEM subsequently compounded its failure to speak by itself mailing the Supplemental Amendment to Ms Huttner's previous address, even though it had long been aware that she had moved from Skadden to Buchanan.[4] *See* Hutt. Dec. ¶ 14, Ex. 8.

**B.      Honeywell Is Entitled To Rescind Any Agreement Between The Parties Due To RHEM's Fraud Or Negligence, Or Honeywell's Mistake**

Under Delaware law, a party to a settlement agreement can rescind the agreement if the other party induced its agreement by fraud, or by negligently misrepresenting material facts. *See E.I. Du Pont de Nemours & Co. v. Florida Evergreen Foliage*, 744 A.2d 457, 465 (Del. 1999) (granting rescission of a settlement agreement based on fraud); *see also Student Fin. Corp*, 2004 U.S. Dist. LEXIS 4952 (citing *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982)). Because RHEM failed to comply with its duty to inform Honeywell about the July 12 Interview (either fraudulently or negligently), Honeywell is

---

[4]      As noted above, there is no merit to RHEM's claim that "Honeywell's unawareness of the Interview Summary is the fault of its litigation and reexamination counsel" because she "apparently … did not update her contact information with the PTO." RHEM Br. at 14. Ms. Huttner filed a proper change of address form with the PTO and her new address was recorded in the PTO's publicly accessible "Patent Attorneys/Agents" database. In any event, the copy of the Interview Summary that the PTO mailed to Ms. Huttner did not arrive at Skadden until July 20, 2007, after RHEM claims that Honeywell agreed to the July 17 Draft. At a minimum, RHEM was obligated to provide Honeywell with a copy of the Interview Summary on July 17, when it claims the July 17 Draft became a binding contract, because ████████████████████████ .

entitled to rescind the July 17 Draft, even if the Court accepts RHEM's claim that it became a binding agreement without Dr. Dicciani's signature.

In order to establish fraud, the party seeking rescission must show (1) a false statement or misrepresentation; (2) that the defendant knew was false or made with reckless indifference to the truth; (3) the statement induced the plaintiff to enter the agreement; (4) the plaintiff's reliance was reasonable; and (5) the plaintiff was injured as a result. *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000) (citation omitted). The only difference between fraud and negligent misrepresentation is that a party's knowledge of falsity need not be proven for negligent misrepresentation. *See, e.g.*, *Norton*, 443 A.2d at 4 ("innocent misrepresentation is sufficient, for though the representation may have been made innocently, it would be unjust and inequitable to permit a person who has made false representations, even innocently, to retain the fruits of a bargain induced by such representations") (citation omitted).

Even if RHEM did not affirmatively misrepresent the status of the pending reexaminations to Honeywell (and it did), RHEM's deliberate concealment of material facts, or silence in the face of a duty its speak, constitutes fraud. *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983) ("one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading"); *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992) (same). Moreover, "[a] misrepresentation need not be in the form of written or spoken words. Stated simply, a misrepresentation is merely an 'assertion not in accordance with the facts . . . and such an assertion may be made by conduct as well as words." *Norton*, 443 A.2d at 5 (citation omitted).

Viewing the facts here in the light most favorable to Honeywell, it is clear that Honeywell can establish the necessary elements of fraud. RHEM knew or should have known that Honeywell was in the dark about the July 12 Interview when RHEM told Honeywell during settlement negotiations that nothing had happened in the Reexaminations. RHEM made a conscious decision not to tell Honeywell about the July 12 Interview so that Honeywell would continue to negotiate. RHEM also knew, or had reason to know, that Honeywell was relying on its assurances about the status of the Reexaminations in assessing the merits of the proposed settlement because Honeywell had no other means of obtaining "real time" information about the *ex parte* reexamination proceedings, and had repeatedly asked for this information. With no ability to participate in the Reexaminations, Honeywell justifiably relied upon RHEM's statements about the lack of any new developments. Finally, Honeywell was damaged by RHEM's concealment of the July 12 Interview because it was induced to pay more for the alleged settlement than it would have agreed to had it known about the July 12 Interview before July 17.

*E.I Du Pont* is on point. In that case, the plaintiffs plant nurseries sued the defendant chemical company for damaging their plants with a fungicide. The plaintiffs eventually settled for a specific sum. Later, the plaintiffs sought to rescind the settlement agreement after they discovered the defendant had withheld information about the toxicity of the fungicide during discovery in order to induce the plaintiffs to settle for less than they otherwise would have accepted. Under these facts, the Delaware Supreme Court ruled that plaintiffs were entitled to seek rescission.

The court observed that permitting a party to induce a settlement under false pretenses "would seriously undermine the requirement of *bona fide* in the execution of contracts and undermine confidence in the dispute resolution goal of promoting settlement of litigation." *Id.* at 462. Moreover, "[p]laintiffs allege[d] that, had they known of the concealed data and information, they would have been in a more advantageous position . . . and would have been able to achieve either a judgment in their favor or a more favorable settlement." *Id.* at 459. The same is true here; Honeywell would not have agreed to the financial terms in the July 17 Draft if it had known about the July 12 Interview. *See* Jacob. Dec. ¶ 59. The fact that the Examiner refused at the Interview to agree to the patentability of the proposed amendment is a strong indication that the amended claims will be rejected. RHEM's failure to disclose the existence of the Interview and its results, compounded by its explicit denials of any activity in the Reexaminations, was a fraudulent inducement. Honeywell therefore should be entitled to rescind the July 17 Draft.

**C.    The Fact That** ███████████████████████████████████
████████████████████████ **Has Nothing To Do With RHEM's Concealment Of The July 12 Interview**

RHEM attempts to justify its failure to tell Honeywell about the July 12 Interview by arguing that the ████████████████████████████████████████████ ████████████████████████████████. This argument misses the point. It is irrelevant that the ████████████████████████████████████████████████ ████████████████████████. ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ It was

25

not intended to vitiate RHEM's obligation to update Honeywell about any new

developments in the Reexaminations *before* a settlement was finalized, so that Honeywell

could decide whether or not to settle the at the price RHEM had proposed.

Moreover, ████████████████████████████████████████

██████████████████████████████████████ After Honeywell learned about

the negative events that occurred at the July 12 Interview, ████████████████████

█████████████████████████████████ ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████.

Accordingly, for this additional reason, RHEM's argument that the referenced provision

moots the relevance of the results of the July 12 Interview is disingenuous and misses the

point.

### D.    Honeywell Is Also Entitled To Rescind The July 17 Draft Due To Its Honest Mistake

RHEM's Motion should be denied because Honeywell is entitled to rescind any

agreement with RHEM based on its legitimate mistake about the status of the

Reexaminations.  Under Delaware law, a party to a contract may rescind the contract

based upon unilateral mistake if:  "(1) the enforcement of the agreement would be

unconscionable; (2) the mistake relates to the substance of the consideration; (3) the

mistake occurred regardless of the exercise of ordinary care; and (4) it is possible to place

the other party in the *status quo*."  *In re Enstar Corp.*, 604 A.2d 404, 411 (Del. 1992)

(rescinding settlement agreement because of defendants' mistaken belief during

negotiations that plaintiffs were still stockholders, and therefore in possession of

something entitling them to relief); s*ee also Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*,

794 A.2d 1141, 1151 (Del. 2002) (unilateral mistake shown where one party was mistaken about a material provision of the contract, and the other party knew of the mistake but remained silent).

Each of these factors is satisfied here. Honeywell's mistake about the current state of the Reexaminations occurred in spite of Honeywell's exercise of more than ordinary care. Honeywell repeatedly specifically asked RHEM about the status of the Reexaminations, and Honeywell was diligent in frequently searching PAIR to determine if anything new had happened.

If RHEM had timely disclosed the July 12 Interview, Honeywell would not have agreed to the financial terms set forth in the July 17 Draft. *See* Jacob. Dec. ¶ 59. Finally, it is possible to restore RHEM to the *status quo ante* because rescission will still permit RHEM to continue this litigation to seek monetary damages for Honeywell's alleged infringement.

## IV.    RHEM IS NOT ENTITLED TO SPECIFIC PERFORMANCE OF THE JULY 17 DRAFT

This Court should deny RHEM's Motion for specific performance of the July 17 Draft because RHEM can obtain adequate relief by pursuing its claims for patent infringement damages against Honeywell.[5] *See Equitable Trust Co. v. Gallagher*, 102 A.2d 538, 546-47 (Del. 1954).

---

[5]    This Court likewise should not grant specific performance of the July 17 Draft because RHEM procured Honeywell's provisional and contingent agreement to settle the case on July 17 through fraud. *See, e.g., Matthes v. Wier*, 84 A. 878, 881(Del. Ch. 1912) (in order to be entitled to specific performance the contract must be free from fraud); *El Paso Natural Gas Co. v. TransAmerican Natural Gas Corp.*, 669 A.2d 36, 41 (Del. 1995) (noting that if the settlement agreement resulted from fraudulent inducement, the settlement agreement will be a nullity).

"A party seeking specific performance has the burden of proving the existence and terms of an enforceable contract by clear and convincing evidence. *Williams v. White Oak Builders, Inc.*, Civ. A. No. 17556, 2006 Del. Ch. LEXIS 112, at *16 (D. Del. June 6, 2006) (citation omitted). "[T]he remedy of specific performance is designed to take care of situations where the assessment of money damages is impracticable or somehow fails to do justice." *Id.* at 546. Indeed, while "a damages remedy is routinely available . . . specific performance is considered extraordinary[ and is] awarded on a discretionary basis" only when it is equitable to do so. *See Morabito v. Harris*, Civ. A. No. 1463-K, 2002 Del. Ch. LEXIS 27 (Del. Ch. Mar. 26, 2002) (denying specific performance); *Wilmington Trust v. Lee*, Civ. A. Nos. 4000, 4241 & 4924, 1978 Del. Ch. LEXIS 572 (Del. Ch. Jan. 19, 1978) (denying a motion for summary judgment requesting specific performance of an allegedly illegal settlement agreement, and holding that the "long-pending litigation must go to trial" because of "differences as to material facts which require that the case be tried."); *Williams*, 2006 Del. Ch. LEXIS 112 (denying specific performance because money damages were adequate remedy at law); *Robbins v. Tremont Medical, Inc.*, C.A. No. 15117, 1997 Del. Ch. LEXIS 6, at *10 (Del. Ch. Jan. 16, 1997) (reciting plaintiff's requests for specific performance of various contracts and stating that these are "requests which this Court may not grant if plaintiff has an adequate remedy at law.").

Here, specific performance of the July 17 Draft is inappropriate because RHEM has an adequate remedy at law through the continuation of the underlying patent litigation. The July 17 Draft does not contain any benefits for RHEM that are unique or unable to be valued. █████████████████████████████████████

████████████████████████████  This same benefit can be secured

by continuing this litigation.  *See Equitable Trust Co.,* 102 A.2d  at 547 (denying specific

performance because corporate shares at issue had no unique value that could not be

redressed with money damages); *Cheese Shop Int'l, Inc. v. Steele*, 303 A.2d 689, 691

(Del. Ch. 1973) (while "[u]niqueness may be a basis . . . [for] the inadequacy of remedy

at law . . . it is the performance due the party seeking specific performance that must be

unique, otherwise the remedy at law is adequate.") (citations omitted).

## V.    HONEYWELL HAS THE RIGHT TO RELEVANT DISCOVERY AND AN EVIDENTIARY HEARING BEFORE THIS COURT CAN GRANT RHEM'S MOTION

There is no dispute that Honeywell neither approved nor executed the July 17

Draft.  There also appears to be no dispute that Honeywell did not know about the July 12

Interview and the Interview Summary until June 20, 2007 and that RHEM never

disclosed the occurrence of the July 12 Interview or the existence of the Interview

Summary to Honeywell at any time before July 25, 2007.  Accordingly, based on these

undisputed facts, this Court should deny RHEM's Motion for the reasons discussed

above.

Should the Court, however, find there to be a dispute of material fact concerning

the existence and enforceability of the alleged settlement agreement, Honeywell is

entitled to take relevant discovery and to an evidentiary hearing before the Court may

resolve this dispute against Honeywell.  *See* Fed. R. Civ. P. 56(f) (the Court "may refuse

the application for judgment or may order a continuance to permit affidavits to be

obtained or depositions to be taken or discovery to be had or may make such other order

as is just").

29

Among other things, before these issues can be resolved against Honeywell, discovery may be necessary to determine: (1) the parties' actions and statements concerning their intent to be bound to a settlement in the absence of a signed agreement; (2) the intent and understanding of the parties in negotiating paragraph 3.5 of the draft agreement; (3) the dates and circumstances concerning RHEM's decision to schedule the July 12 Interview; (3) Honeywell's requests for news of any developments in the Reexaminations; (4) RHEM's awareness that the PTO mailed the Interview Summary to Ms. Huttner's former address and its own decision to mail the Supplemental Amendment to that old address; and (5) RHEM's real reasons for failing to disclose the July 12 Interview to Honeywell. Once this discovery is complete and the Court has held an evidentiary hearing, the Court would be in an better position to decide RHEM's Motion based on a more fully developed record, if the current record is insufficient   Until that time, Honeywell respectfully submits that RHEM's Motion cannot be granted.

Finally, RHEM's request for attorneys fees is also without merit and should be rejected. First, given RHEM's wrongful conduct in concealing the July 12 Interview from Honeywell, and the fact that the July 17 Draft was never approved and signed by Honeywell, it is simply preposterous for RHEM to request its attorneys fees in connection with Honeywell's defense of RHEM's baseless Motion. If any party should be awarded its costs and attorneys fees, it is Honeywell, which has been forced to oppose an application that never should have been made. Second, the cases cited by RHEM are inapposite. In both *Hobbs & Company, Inc. v. American Investors Management, Inc.*, 576 F.2d 29 (3d Cir. 1978) and *Leonard v. University of Delaware*, 204 F. Supp.2d 784 (D. Del. 2002), there was no dispute that a settlement had been reached. That is clearly

not the case here.  Further, the authority cited by RHEM acknowledges that "a request for attorneys' fees should be granted only in exceptional circumstances" (*Leonard*, 204 F. Supp.2d at 789) and "are not ordinarily recoverable . . . unless specifically authorized by statute . . . [and] are awarded only in extraordinary circumstances." *Hobbs & Co., Inc.*, 576 F.2d at 35.  None of the exceptions to this well established rule apply here. Honeywell has not willfully disobeyed a court order, nor is Honeywell a "losing party" that has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* Accordingly, this Court should decline RHEM's request for an award of attorneys fees.

## CONCLUSION

For the foregoing reasons, this Court should deny RHEM's Motion.  Honeywell also respectfully requests that the Court enter an order awarding Honeywell its costs and attorneys fees incurred in responding to RHEM's Motion.

BUCHANAN, INGERSOLL & ROONEY, PC

/s/ James D. Taylor, Jr.,
William E. Manning, Esq. (#697)
James D. Taylor, Jr., Esq. (#4009)
1000 West Street, Suite 1410
Wilmington, DE  19801
(302) 552-4200
william.manning@bipc.com
james.taylor@bipc.com

Of Counsel:

BUCHANAN, INGERSOLL & ROONEY, PC
Constance S. Huttner, Esq.
Ryan P. Farley, Esq.
One Chase Manhattan Plaza
New York, New York  10005
(212) 440-4400

Dated:  August 24, 2007                *Attorneys for Honeywell International Inc.*